**Dated: June 2, 2022**

**The following is ORDERED:**



Sarah A Hall
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In re: ) | |
| ) | |
| AARON K. LUCAS and ) | Case No. 20-12664-SAH |
| JESSICA B. LUCAS, ) | Chapter 7 |
| ) | |
| Debtors. ) | |
| _____ ) | |
| ) | |
| FRANK HILL; KARI HILL; ) | |
| FLIPPIN OK V, LLC; and ) | |
| FLIPPIN OK VI, LLC, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Adv. Pro. 20-01075-SAH |
| ) | |
| AARON K. LUCAS and ) | |
| JESSICA B. LUCAS, ) | |
| ) | |
| Defendants. ) | |

### <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

On January 5, and February 14, and 15, 2022, a video-conference trial was conducted in

the above-captioned adversary proceeding.  The issues before the Court are set forth in the Final

Pretrial Order [Doc. 56], entered on November 19, 2021.  Plaintiffs Frank Hill ("Dr. Hill") and

Kari Hill ("Mrs. Hill"; Dr. and Mrs. Hill collectively, the "Hills") appeared in person and through their attorney Julie M. Ezzell.  Defendants Aaron Lucas ("Aaron") and Jessica Lucas ("Jessica"; Aaron and Jessica collectively, "Debtors") appeared in person and through their attorney Gary D. Hammond.

## JURISDICTION

The Court has jurisdiction to conduct the trial of this matter pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409.  Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a), and this is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I) and (J).  Additionally, the parties have consented to this Court's entry of final orders and judgments pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012.

## BACKGROUND

"Unfortunately, this case presents the all too common circumstance of a 'home remodel gone wrong' that resulted in the contractor filing for bankruptcy protection and the homeowners seeking to hold the contractor responsible for broken promises and unsatisfactory results.  The outcome is not surprising given the lack of customary business formalities ordinarily employed in projects of this magnitude."  Pino v. Jensen (In re Jensen), No. AP 17-01078, 2019 WL 2403105, at *1 (10th Cir. BAP June 7, 2019).  Moreover, the home in question contained a series of latent defects unknown to either the Hills or Aaron at the time of contracting; the defects were of such magnitude they wreaked havoc with the planned time line and budget negotiated by the Hills and Aaron.  Eighteen months into the 6 month project, the Hills terminated Aaron and began a long journey of seeking recompense from Aaron and his company, Lucas Roofing and Construction Inc.  As could be expected, that action ultimately lead to this Court.

2

**FINDINGS OF FACT**[1]

**Parties**

1.    The Hills are husband and wife and are residents of Edmond, Oklahoma.

Stipulation ¶ I.F.1.  Dr. Hill is a chiropractor, and Mrs. Hill is a stay-at-home mother.

2.    Aaron is a building contractor who started doing roofing and remodeling in 2007,

eventually moving into new construction as well.  While acting as the general contractor,

Aaron also performed labor on his projects.

3.    Lucas Roofing and Construction Inc. ("Roofing") is an Oklahoma corporation owned by

Debtors.  Bankruptcy Case Doc. 29-1, p. 12.[2]

**The Dream Home and the Project**

4.    In 2018, the Hills located a home and land at 8700 E. Covell in Edmond, Oklahoma (the

"Home") that, with ***substantial*** remodeling, could be developed into their "million dollar"

dream home.

5.    The Hills paid for a third party inspection of the Home.

---

[1]The Hills' manner of proof, such as providing conclusory statements unsupported by separate evidence or submitting incomplete or inconsistent documents, caused the Court's review of the evidence to be difficult and time consuming.  Bruno Mach. Corp. v. Troy Die Cutting Co., LLC (In re Bruno Mach. Corp.), 435 B.R. 819, 841 (Bankr. N.D. N.Y. 2010).  The Court undertook an extensive and timely review of the evidence submitted and ultimately concluded the facts do not establish the Hills' right to the requested relief.

[2]It is well established that a court may take judicial notice of its own records as well as records of other courts, particularly in closely related cases.  Hutchinson v. Hahn, 402 Fed. App'x 391, 394-95 (10th Cir. 2010) (citing St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979)); Cornforth v. Fidelity Investments, CIV-16-173-R, 2017 WL 650132, at *2 (W.D. Okla. Feb. 16, 2017).

6.      The Hills purchased the Home in early 2018.  Unfortunately, before the Hills could move in, a pipe burst in the Home in March 2018, causing a water leak and substantial damage.  The damage was repaired using insurance proceeds before the Hills' remodel began.

7.      The Hills had a total budget of $200,000 for the remodeling and construction project on the Home.

8.      The Hills reached out to Aaron to have him look at the Home and submit a bid for the remodel of and addition to the Home (the "Project")[3] in March 2018.[4]

9.      The Hills asked Aaron about his qualifications.  Aaron advised the Hills the Project did not present anything new for Aaron and Roofing.  He provided the Hills with proof of insurance and pictures of his past work.  Aaron also represented he was a licensed, experienced, insured, and bonded roofer, which was true at the time.[5]  Aaron further advised the Hills all of Roofing's subcontractors were licensed.

10.     The Hills did little else to check into Aaron or Roofing, accepting his representations, pictures of his past work, and friends' recommendations at face value.

11.     In preparing his bid for the Project, Aaron reviewed the inspector's report and was able to access the Home once but was denied access to the Home on several occasions by the prior owners.

---

[3]Specifically, the Project encompassed an upstairs remodel and addition to the backside of the Home including a kitchen, laundry room, half bath, mud room, and garage.

[4]The Hills reached out to Aaron and Roofing based on FaceBook reviews and recommendations by friends.  The Hills checked with two of the references provided by Aaron and Roofing, both of which were good.

[5]However, Aaron did not renew his roofing license, and it was suspended in April 2018.

12.  The Hills obtained other bids for the Project but selected Roofing because Aaron was
     personable, understood them, and his bid came in near their $200,000 budget after
     reducing the scope of the Project.

**The Contract**

13.  The Hills and Aaron, on behalf of Roofing, signed a contract for turnkey completion of
     all items originally bid for the Project for $207,973.98 (the "Contract") in March 2018.
     Stipulation ¶ I.F.1.

14.  The Contract specifically provides "any items added to this scope of work may result in
     additional pricing." (Defendants Ex. 5, p. D-000242.)

15.  Attached to the Contract are "Extras and Options," signed by Dr. Hill and Aaron, for
     items the Hills wanted but were not sure about given the cost. (Defendants Ex. 5, p.
     D-000250.)

16.  The Contract states the estimated time to complete the Project is 6 months "but may take
     longer due to weather, special orders, and scheduling delays." (Defendants Ex. 5, p.
     D-000246.)

17.  The Contract provides: "All permits, inspections, and certifications are at the
     responsibility of all lisc. Sub-contractors. Building permits are at the responsibility of
     [Roofing]." (Defendants Ex. 5, p. D-000246.) The Contract also provides (i) all
     subcontractors will be licensed and insured and will provide proof of such before work
     commences and (ii) all permits and inspections will be completed in full to ensure proper
     documentation and code enforcement. (Defendants Ex. 5, p. D-000251.)

18. The Contract contains a Roofing Warranty Certificate for 5 years and a Construction Warranty Certificate for 2 years, both signed by Aaron as managing partner of Roofing. (Plaintiffs Ex. 34, pp. 12-13.)  The warranties played a role in the Hills executing the Contract because they wanted someone willing to stand behind their work.

19. When Roofing entered into the Contract, Aaron intended Roofing would perform the work required thereunder, and Aaron believes Roofing completed the work as promised and then some.

20. The Hills paid Roofing an initial deposit of $51,993.50 for the Project.  (Defendants Ex. 5, p. D-000252; Defendants Ex. 1, p. D-000177.)

**The Project Work**

21. Dr. Hill considers himself pretty handy and is not afraid of doing projects around the Home.  Dr. Hill resided in the Home throughout the Project, and so he saw the work being done there on a daily basis.  He, in fact, assisted on the Project as the "Latent Defects" (defined below) were discovered and threatened to derail the Project given their severity.

22. Mrs. Hill, in contrast, is more knowledgeable as to the business and financial side of the Project as she handled the bills and payments.  Mrs. Hill was largely present at the Home during the remodel.

23. During the course of the Project, serious latent defects in the Home came to light which required at least $130,000.00 to correct separate and apart from the Project (the "Latent Defects").  (Plaintiffs Ex. 47, ¶¶ 12 and 16.)  The Latent Defects were neither identified in the inspector's report nor disclosed by the Hills or the prior owners.

6

24. Dr. Hill was unable to articulate the extent of the Latent Defects in the Home. He claimed Aaron would tell him about a defect and the cost to fix it, sometimes fixing it without discussion. Dr. Hill apparently never asked for written or visual identification of any of the Latent Defects while Aaron and Roofing were working on the Project. In an effort to stay on budget given the Latent Defects, Dr. Hill offered to do what work he could, such as hanging boards, painting, and master bathroom work; he was advised by Aaron they would be reimbursed for his work on invoices. Dr. Hill estimates he worked 10-15 hours a week for at least one year on the Project. However, the Hills provided no specific details of Dr. Hill's work, no documentary evidence thereof, no accounting of his time, the value thereof, nor did they explain with any specificity the credits they believe they should have received, but did not, on the Project invoices submitted by Roofing.

25. The Hills directly paid for some Project expenses themselves, such as the new heating and air conditioning unit downstairs, granite for the kitchen and bathroom, light fixtures, and paint. (Plaintiffs Ex. 42.) The amount directly paid by the Hills for materials for the Project total $24,176.48 based on the record. There was no evidence Roofing or Aaron charged the Hills for any items purchased directly by the Hills.

26. During the course of his work on the Project, Aaron had daily conversations with Mrs. Hill and spoke and texted with Dr. Hill often with updates.

27. The Hills became concerned about the Project's lengthiness and quality of the work in late 2018. *Nevertheless, the Hills continued to allow Aaron and Roofing to work on the Project for almost another year.*

28.  The Hills discovered water in the Home in February 2019 due to improper grading of their Home site for which they blame Aaron and Roofing.  Nevertheless, Aaron and Roofing were allowed to continue their work on the Project with nary a complaint.

29.  On February 12, 2019, Roofing sent a letter to the Hills providing "an itemized and detailed report of ***repairs completed by*" Roofing and *"is to be considered 'In Addition to' initial agreed on bid.*"  (Plaintiffs Ex. 39) (emphasis added.)  The additional work and charges incurred on the Project in February 2019 as a result of the Latent Defects totaled $150,072.00 *in addition* to the Contract price.  (Plaintiffs Ex. 39.)

30.  From late 2018 to July 2019, Dr. Hill repeatedly declared his satisfaction with Aaron's and Roofing's work on the Project on social media.  (Defendants Ex. 4.)  Dr. Hill even publicly declared, ***eleven months into the Project***, delay was no fault of Aaron who was standing up to the challenges and providing the Hills with a quality home.  (Defendants Ex. 4, p. D-000220.)

31.  Roofing submitted 10 invoices to the Hills for work on the Project (the "Invoices").  (Plaintiffs Ex. 36.)[6]  The Hills promptly paid 8 of the Invoices when received without any discussion with Aaron or Roofing and any dispute.[7]

---

[6]Plaintiffs Exhibit 36 is incomplete.  Invoices Nos. 350 and 354 (pp. 36, 38) both reflect being 2 pages, but Plaintiff's Exhibit 36 includes only the first page of each invoice and does not reflect a total amount for either invoice.   Defendants Exhibit 2 contains all of the invoices periodically sent by Roofing and received by the Hills for the Project.  Sloppy preparation of exhibits caused numerous problems and frustrations at trial and in drafting this opinion.  The Court cautions counsel to learn from her mistakes.

[7]Aaron disagrees, claiming there was always a discussion about what the invoice covered, with Aaron believing he answered all of their questions.  This fact is not relevant; the Hills paid all of the invoices issued by Roofing except one.

32.     With respect to Invoice No. 356 for $9,680.00 (the ninth invoice), Mrs. Hill testified she

        emailed Aaron and suggested this should be their final payment and then paid Invoice

        No. 356.

33.     The Hills did not pay the final invoice sent by Roofing, Invoice No. 402 for $20,000

        because Roofing had been paid almost $300,000, well over the Contract price by this

        point.

34.     The Hills paid Roofing a total of $315,414.39[8] on invoices sent on the Project and for

        work on the Latent Defects.

**The Dispute between Roofing, Aaron, and the Hills**

35.     On October 22, 2019, Aaron emailed a list of items Roofing needed to complete on the

        Project (the "Unfinished Items").  (Plaintiffs Ex. 35, pp. 66-67.)   The Hills, however, did

        not allow Aaron or Roofing to complete the Unfinished Items.

36.     Contemporaneously with sending the Unfinished Items to the Hills, Aaron also emailed

        the Hills a "completed job cast," which was a compilation of the services and supplies

        rendered by Roofing under the Contract to date together with all payments and credits.

        (Plaintiffs Ex. 35, pp. 58-64.)

37.     The Hills then prepared a list of items not completed or completed unsatisfactorily under

        the Contract during a walk through of the Home.  The Hills claim the list is incomplete as

        they still find poor or incomplete work in the Home.  (Plaintiffs Ex. 44.)  The Hills,

        however, never detail their findings, provide any evidence thereof, or calculate the

        amount required to rectify the poor and incomplete work on the Project.

_____

[8]See infra Table, ¶ 55.

9

38. In the end, the Project took too long, communication broke down, and tempers flared. In early November 2019, the Hills parted ways with Aaron and Roofing.

39. Despite the Hill's complaints, the House passed all inspections.

40. Thereafter, Dr. Hill has undertaken several remedial projects on his own as they have available funds. The Hills provided no evidence identifying what work Dr. Hill completed or the cost thereof, either during the Project or after.

41. Unfortunately, only days after the Hills and Aaron and Roofing parted ways, lightning struck the Home and "blew up" a bedroom on the remodeled second floor, cracking the foundation. An inspection following the lightning strike uncovered additional problems with the Home, such as reverse polarity in electrical outlets and sealed rather than removed pipe. Beyond Mrs. Hill's identification of such problems, no other evidence exists in the record detailing the extent or cause of such problems or the cost of repair.

**Hills' Damage Claim[9]**

42. The Hills contracted for the following work to be done to complete and/or repair unsatisfactory work performed by Roofing on the Project at a cost of $3,992.50:

| | | | |
|---|---|---|---|
| AAA Landscape Design | 1/20/2020 | $1,773.20 | Railroad tie retaining wall |
| Today's Seamless Gutters | 5/9/2020 | $1,219.30 | Guttering to fix flooding issue |

_____

[9] The burden is on the Hills to establish the amount of damages or liability owed by Aaron and/or Roofing. For the most part, the Hills "merely made conclusory statements," failing to provide the Court with the necessary underlying facts to calculate their alleged damages. Ali v. Merchant (In re Ali), No. 13-50724-CAG, 2015 WL 4611343, at *64 (Bankr. W.D. Tex. July 23, 2015).

10

| | | | |
|---|---|---|---|
| Jorge Sanchez | 5/4/2020 | $1,000.00 | Side lights on front entry and cabinets for master bath |

However, no evidence identifies Aaron and/or Roofing as the source or cause of the needed repairs.  The Hills also claim they obtained additional bids for further repairs needed, but cannot afford to pay for them.  However, yet again, other than their descriptions of defects, the record contains no evidence of such defects, the cause thereof, or the cost to repair.

43.     Jorge Sanchez ("Sanchez") worked for Lucas Roofing from 2014 through October 2019 as an independent contractor and worked on the Hills' Home for the majority of the Project, doing finishing work.  Sanchez testified Roofing used rough materials for the finish work on the Project, the quality of which might be found in a rent home but not a luxury home.

44.     Per Sanchez, Roofing used insufficient insulation in the addition to the Home, used piece lumber for framing, cut into framing to install windows jeopardizing the structural integrity thereof, failed to properly cancel old plumbing in the master bathroom, used rejected lumber for lighting installation, and completed electrical installation without a licensed electrician and was only a quarter complete when he quit in 2019.  The Hills presented no evidence identifying the reduction of the Home's value due to such inferior workmanship or the cost of repairs necessary to bring the defective or shoddy workmanship up to suitable levels.

45.     Roofing subcontracted all of the electrical work on the Project to Prompt Electric. Christian Pana ("Pana"), a licensed electrician and owner of Prompt Electric, testified

about his work on the Project.  Pana testified Prompt Electric issued 3 invoices on the Project; nevertheless, the Hills presented only one Prompt Electric invoice as evidence, an invoice for $3,862.00 dated January 11, 2019, for porch lights, garage rough in with extra receptacles other than code requirements, troubleshooting movie room, and rough in addition.  (Plaintiffs Ex. 42, p. 7.)  Pana testified Prompt Electric also upgraded the electrical service panel, which he estimates cost $1,000, but no other Prompt Electric invoices are in the record evidencing the totality of the services rendered by Prompt Electric or the actual costs thereof to Roofing.

46. The Hills claim Prompt Electric only charged Roofing $3,862.00 for work on the Project (contrary to even Pana's testimony) but Roofing charged them $7,160.00 for the same work.  No evidence supports this claim beyond Dr. Hill's testimony.  Additionally, Dr. Hill claims he paid one Prompt Electric invoice directly for work in the garage but again, no invoice or proof of payment thereof is in the record before the Court.[10]

47. The Hills claim Aaron and Roofing charged them over and above suppliers' invoiced prices and collected the inflated price from the Hills.  However, the only evidence presented in support was the single Prompt Electric invoice which does not, in fact, support such claim.  Moreover, per Aaron, Prompt Electric invoiced Roofing for labor only since Roofing bought the materials for Prompt Electric as it does for all its subcontractors.

---

[10]The Court discounts Dr. Hill's testimony on the billing and invoices of Roofing and its subcontractors and suppliers, including Prompt Electric, based on his own admission the numbers were not his forte and were under the supervision of his wife, who did not testify on the subject of Prompt Electric's billing and payment.

12

48.  Pana believes a lot of the work in the Home was completed by non-licensed electricians, including Dr. Hill and Aaron.  Dr. Hill's and Aaron's work was not quantified, nor was the cost to repair their work, if repairs were indeed necessary.

49.  Undeniably, the Project came in over budget.  The Hills failed, however, to present any evidence the cost overruns were incurred due to fraud, misrepresentation, or improper billing practices by Aaron and Roofing as opposed to repairs due to the Latent Defects or some other cause.

**The State Court Action**

50.  Unsatisfied with the Project, the Hills filed suit against Aaron and Roofing, among others, in the District Court of Oklahoma County (the "State Court"), Case No. CJ-20-485 (the "State Court Action") on January 27, 2020.[11]  Stipulation ¶ I.F.2.

51.  In the State Court Action, the Hills raised claims against Aaron and Roofing that they (i) failed to perform certain portions of the Contract, (ii) over charged the Hills for materials and work the Hills either directly provided or paid for, resulting in embezzlement, (iii) claimed costs of materials far in excess of the Contract prices, resulting in embezzlement, (iv) performed work in an unsafe and un-workman like manner that damaged their property and required extensive repairs, (v) failed to carry liability insurance and be bonded as required under the Contract, (vi) failed to have professional licensing as required, and (vii) made fraudulent statements regarding Aaron's experience, work methods, skill and ability.  The Hills also claimed Aaron

---

[11]Not surprisingly, the Hills also sued the former owners of the Home and the home inspector used by the Hills when purchasing the Home.  In their complaint, the Hills allege over $130,000 was required to correct the Latent Defects.  (Plaintiffs Ex. 47, p. 5.)

committed other acts of fraud, embezzlement, and fraudulent misrepresentation. Stipulation ¶ I.F.2.

52.   On June 10, 2020, a default judgment was entered in the State Court Action in favor of the Hills and against Aaron in the amount of $142,286.02, plus additional attorney's fees, fees, costs, and statutory interest.  Stipulation ¶ I.F.3.

53.   While Mrs. Hill claims the State Court Judgment for $142,286.02 is not necessarily reflective of their actual damage because they constantly find new defects needing to be fixed, the Hills failed to present any evidence quantifying such additional damages.

54.   The Hills now claim total damage of $159,726.02,[12] calculated as follows (Plaintiffs Ex. 46, p. 7):

| | |
|---|---|
| Contract price | $207,973.98 |
| Less amount actually paid | ( 309,181.00)[13] |
| Cost overrun | 101,207.02 |
| Less repairs required due to prior owner | (71,921.00)[14] |
| Amount overpaid to Lucas Roofing | 29,286.02 |

---

[12]Per the Hills, this figure is ever increasing due to the discovery of additional problems with Roofing's work on the Project, but no attempt was made by the Hills to identify the additional damages or their cost to repair.

[13]This figure differs from any figure presented at trial or calculable from the evidence presented.

[14]The cost to repair the Latent Defects according to the Hills' complaint against the prior owners and the home inspector is nearly double the amount claimed here, $130,000.00. (Plaintiffs Ex. 47, p. 5.)

| | | |
|---|---|---|
| Cost to repair bad work by Lucas Roofing | 48,910.00[15] | |
| Overcharges and double charges by Lucas Roofing | 41,530.00 | |
| Loss of warranties | 40,000.00 | |
| TOTAL DAMAGE CLAIMED | $159,726.02 | |

Other than uncorroborated testimony of the Hills, no evidence in the record quantifies these dollar amounts by a preponderance of the evidence.

55.     Each of the payments received by check from the Hills was deposited in Roofing's bank account at Quail Creek Bank, Account No. XXX2654 (the "Roofing Account"):[16]

| Date | Amount | Defendants Ex. 1 |
|---|---|---|
| 03/09/2018 | $51,993.50 | D-000177 |
| *05/03/2018* | *$6,508.64* | *D-000161* |
| *05/07/2018* | *$6,915.81* | *D-000161* |
| 07/11/2018 | $21,750.00 | D-000146 |
| 08/10/2018 | $41,070.00 | D-000138 |
| 10/09/2018 | $15,260.00 | D-000125 |
| *10/30/2018* | *$15,548.86* | *Plaintiffs Ex. 50, p. 1* |
| 11/09/2018 | $25,314.04 | D-000118 |

[15]The Hills only presented evidence of $3,992.50 in possible repair costs.

[16]Per Aaron, Roofing did not accept payment by credit card but only by check. But Aaron later agreed, in May 2018, the Hills paid Roofing $13,424.45 by credit card. Roofing accepted payments for a limited period of time through Builders Trend which accounts for the payments Aaron omitted. (Plaintiffs Ex. 49.) The credit card payments are noted in italics in the chart above as well as additional payments that were overlooked by Debtors in preparing the chart but confirmed under examination as having been received. Additionally, one payment amount was reduced to reflect the Hills' payment did not comprise the entire deposit.

| | | |
|---|---|---|
| *12/07/2018* | *$20,250.00* | *Plaintiffs Ex. 50, p. 1* |
| 12/13/2018 | $13,340.00 | D-000111 |
| *01/15/2019* | *$2,152.00* | *Plaintiffs Ex. 50, p. 1* |
| 02/07/2019 | *$6,500.00* | Plaintiffs Ex. 1.B. p.1 |
| 02/19/2019 | $25,000.00 | Plaintiffs Ex. 1.B. p. 2 |
| 03/25/2019 | $10,890.00 | D-000106 |
| 04/05/2019 | $ 1,054.00 | D-000095 |
| 04/19/2019 | $ 9,680.00 | D-000096 |
| 06/17/2019 | $ 2,409.56 | D-000067 |
| 06/20/2019 | $ 3,168.00 | D-000067 |
| 07/12/2019 | $11,295.60 | D-000076 |
| 07/22/2019 | $ 5,642.00 | D-000077 |
| 08/01/2019 | $ 5,364.38 | D-000058 |
| 08/06/2019 | $2,608.00 | D-000058 |
| 09/11/2019 | $11,700.00 | D-000053 |
| **TOTAL RECEIVED BY ROOFING** | **$315,414.39** | |

The $315,414.39 paid by the Hills is higher than the amount the Hills claimed they paid and represents another consistency problem with their evidence.

56. Aaron used money received from the Hills exclusively to pay for the Project, and the Hills presented no evidence to the contrary.[17]

---

[17]While the Hills claim Aaron "robbed Peter to pay Paul," other than unsubstantiated statements of Mrs. Hill and Sanchez, no evidence was presented to support this conclusion.

57.  Aaron would periodically transfer funds from the Roofing Account into the [18] (the

"Imbrex Account") to pay for materials and supplies that needed to be purchased with a

debit card rather than a check.  The total amount transferred to the Imbrex Account from

the Roofing Account is $91,330 with any necessary funds in excess of what was paid by

the Hills being advanced by Debtors.

### Bankruptcy Case Preparation[19]

58.  David McBride ("McBride") is an attorney, and Jay Pendley ("Pendley") was a paralegal,

with McBride & Associates ("McBride & Associates"), the law firm that processed

Debtors' Bankruptcy Case.

59.  McBride & Associates sent a Bankruptcy Questionnaire ("Bankruptcy Questionnaire") to

Debtors on October 2, 2019, and again on February 17, 2020.[20]  (Plaintiffs Ex. 11, pp. 1

and 3.)  The Bankruptcy Questionnaire, together with bank statements, proof of income,

and tax returns, are used by McBride & Associates to prepare the bankruptcy petition.

60.  Debtors completed the Bankruptcy Questionnaire and returned it on February 24, 2020,

before meeting with McBride & Associates.  (Plaintiffs Ex. 9 and 11, p. 4.)  During such

---

[18]Imbrex Construction and Remodeling, LLC ("Imbrex") is a business which Aaron owned but not longer operates.  Imbrex ceased operating in 2015 but Aaron continued to use the Imbrex Account as an operating account for Roofing to use when it purchased material and supplies using a debit card rather than a check (such as purchases at Lowe's and Home Depot).

[19]The rather lengthy relevant facts surrounding Debtors' bankruptcy case preparation, in large part, are derived from the Hills' direct examination of witnesses, which in the aggregate, clearly establishes Debtors acted in good faith and without fraudulent intent in all respects in preparing and filing their bankruptcy case.

[20]McBride & Associates routinely sends the Bankruptcy Questionnaire to potential clients prior to meeting with them.

meeting, McBride went over their completed Bankruptcy Questionnaire.  (Plaintiffs Ex. 9.)

61.     Debtors retained McBride & Associates after the February 2020 meeting.

62.     As completed by Debtors, the Bankruptcy Questionnaire was incomplete.[21]

63.     In the Bankruptcy Questionnaire, Debtors disclosed:

a.      6468 Valley View Road, Edmond, Oklahoma as their homestead.  (Plaintiffs Ex. 9, p. 2.)  Additionally, Debtors' home was identified as being owned by the Lucas Family Trust (the "Trust") and subject to the mortgage lien of Cross First Bank.

b.      Their ownership of Roofing from February 2015 to present as well as a bank account in the name of Roofing.  (Plaintiffs Ex. 9, pp. 5 and 12.)

c.      Four bank accounts, two in Debtors' names and one in Roofing's name at Quail Creek Bank and one in Debtors' names at Cross First Bank.[22]  (Plaintiffs Ex. 9, p. 5.)[23]

---

[21]For example, the Bankruptcy Questionnaire, as completed, contained no personal property.  However, such information can be collected later and inserted during the process to complete the bankruptcy petition and related documentation.

[22]McBride testified his firm typically does not identify business accounts in an individual debtor's schedules.  However, the firm's policy is to err on the side of over disclosing when dealing with a debtor operating a business.

[23]Debtors did not identify the Imbrex Account with Quail Creek Bank which is presumably one of the three Quail Creek Bank accounts.

64. Debtors sent "all requested information" to McBride & Associates in late February 2020, including bank statements, tax returns, debts, and credit card statements.  (Plaintiffs Ex. 11, pp. 7-10 and 13-14.)

65. On April 1, 2020, Jessica provided McBride & Associates six months of her paychecks.  (Plaintiffs Ex. 11, pp. 15-16 and 25-30.)

66. On April 5, 2020, Debtors completed their credit counseling course and transmitted the certificates along with their bank statements for 6 months for 3 of their bank accounts and an action plan to McBride & Associates.  (Plaintiffs Ex. 11, pp. 20-24.)

67. On May 20, 2020, Pendley requested Debtors complete a Business Financial Statement[24] using Roofing profit and loss statements previously supplied to McBride & Associates.  (Plaintiffs Ex. 11, pp. 33-34.)

68. Pendley used the Business Financial Statement when preparing the petition and related documents.  The Business Financial Statement is not in any way verified or confirmed by McBride & Associates.

69. In July 2020, garnishment proceedings were commenced against Debtors, and the need to file bankruptcy became more immediate.

---

[24]McBride & Associates requires its clients to prepare the Business Financial Statement when the client is self-employed and does not have pay advices or check stubs evidencing compensation.  (Plaintiffs Ex. 7.)  No reason was provided by either McBride or Pendley for why McBride & Associates did not require Debtors to complete the Business Financial Statement as a result of the February 2020 meeting since Roofing and its imminent closure was discussed during the meeting.

70.    On July 27, 2020, Aaron advised Pendley Debtors sold their GMC Denali and then

owned a Ford.  Pendley requested the certificate of registration for the Ford and the retail

sales contract if financed.  (Plaintiffs Ex. 11, p. 41.)

71.    Pendley prepared Debtors' voluntary petition, summary of schedules, schedules and

declaration, statement of financial affairs, statement of intention, income statement,

creditor matrix, and attorney disclosure.

72.    Aaron and Jessica met separately with Pendley to review the petition and related

documentation, to make any corrections, and to provide additional information to

complete the documents for filing.  Both Debtors provided corrections to the petition and

related documentation although the specific content of the corrections was not presented

to the Court.[25]

73.    Pendley then called Debtors and advised they could sign the petition and related

documentation.  Debtors, who were on their way out of town, met Pendley in the

---

[25]Per McBride, after preparing the bankruptcy petition and schedules, McBride & Associates will have a meeting with their clients to go over the petition and schedules to confirm their accuracy, often making any changes on the spot.  Unless there are significant issues requiring major adjustments to the petition and related documentation, requiring the actual formal signing of the documents to be pushed to a later date, the petition and related documents will usually then be signed by the clients at that meeting.  This corresponds to what happened with Debtors – they met with Pendley to go over the petition and related documents, noted corrections, and then signed "corrected" documents later without separate review.

McBride & Associates' parking lot and signed the documents.[26]  The petition and related documentation were premarked where Debtors needed to sign.

74.    Debtors relied on Pendley to make the requested revisions and corrections and would not have signed the petition and related documentation but for his representation the requested revisions and corrections had been made.

75.    Debtors did not, however, read and review the petition and related documentation to confirm the revisions and corrections had been made before they signed.

## Debtors' Bankruptcy Case

76.    Debtors filed a voluntary chapter 7 petition (the "Petition") in the Western District of Oklahoma on August 11, 2020, commencing Case No. 20-12664 (the "Bankruptcy Case").[27]  Stipulation ¶ I.F.4.

77.    The Petition and related documents were filed electronically with electronically generated signatures.[28]

---

[26]Pendley claimed the parking lot meeting was to sign a reaffirmation agreement. However, McBride does not recall a reaffirmation agreement in the Bankruptcy Case nor do Debtors.  And, in fact, no reaffirmation agreement was filed in the Bankruptcy Case.  See Bankruptcy Case docket generally.  Debtors' Statement of Intention for Individuals Filing Under Chapter 7 filed in the Bankruptcy Case provides for retention and payment, but not reaffirmation, of the home mortgage loan.  (Bankruptcy Case, Doc. 1, pp. 55-56).  Further, none of Plaintiffs Exhibit 11 (the correspondence between McBride & Associates, Pendley, and Debtors) contains any reference to a reaffirmation agreement.

[27]Notwithstanding multiple inquiries, and perhaps due in part to the pandemic, an inordinate amount of time passed before Debtors' bankruptcy case was actually filed.  Debtors and McBride & Associates lay the blame at each other's feet, but the delay and fault are irrelevant to the issues before the Court.

[28] The Court takes judicial notice of Doc. 1 in the Bankruptcy Case (and all subsequent amendments thereto).  Counsel for the Hills suggested Plaintiffs Ex. 18, which contains Debtors'

(continued...)

78.    Debtors provided their tax returns to McBride & Associates who then provided them to

the Bankruptcy Case trustee.  McBride & Associates generally reviews the tax returns to

determine if there are any sources of income or assets omitted from the Schedules and

SOFA.

79.    Attached to the Petition were Debtors' Schedules (the "Schedules") and Statement of

Financial Affairs (the "SOFA").  (Bankruptcy Case Doc. 1, pp. 10-41 and 42-54.)  The

Petition, Schedules, and SOFA are not carefully or precisely drafted documents.  For

example:

a.    The Petition identifies 6848 Valley Road, Edmond, Oklahoma (the "Wrong

Address") as Debtors' home address.  (Bankruptcy Case, Doc. 1, p. 2.)

b.    The Wrong Address continues throughout the original Petition and supporting

documentation.

i.    Schedule A/B reflects Debtors as joint tenants, rather than the Trust, as

the owners of the Wrong Address, which they subsequently claim as their

exempt homestead on Schedule C.  (Bankruptcy Case, Doc. 1, pp. 10

and 15.)

---

[28](...continued)
"wet signatures," was the exact same as the electronically signed and filed Doc. 1 in the
Bankruptcy Case.  However, such is not the case, and the disparity caused unnecessary confusion
during and after trial.  For instance, McBride testified about Aaron scheduling income from a
business of $2,918.11 from Roofing per Plaintiffs Ex. 18, pp. 35-36.  However, per Schedule I in
Doc. 1 in the Bankruptcy Case, Aaron was unemployed and had no income.  (Bankruptcy Case,
Doc. 1, pp. 36-37.)  Neither Pendley nor McBride provided any explanation for why the "wet
signature" petition signed by Debtors differs from the Petition actually filed in the Bankruptcy
Case.

      ii.     Schedule D identifies Cross First Bank as the mortgage holder on the Wrong Address and a secured creditor in the amount of $258,156. (Bankruptcy Case, Doc. 1, p. 20.)

      iii.    Cross First Bank is also identified as the holder of an unsecured claim on Schedule E/F in the amount of $257,435.54. (Bankruptcy Case, Doc. 1, p. 26.)

      iv.    The Statement of Intention reflects the Wrong Address as well. (Bankruptcy Case, Doc. 1, p. 55.)

c.     In the SOFA, question 19 provides "No" as to whether Debtors transferred any property to a self-settled trust of which Debtors are a beneficiary. (Bankruptcy Case, Doc. 1, p. 50.)

d.     Ownership of Roofing and Imbrex is not disclosed in Schedule A/B. (Bankruptcy Case, Doc. 1, p. 12, question 19.) Nevertheless, a bank account for Roofing is disclosed on the same page of Schedule A/B, with the same Roofing account later claimed as exempt on Schedule C. (Bankruptcy Case, Doc. 1, p. 12, question 17 and p. 16.) Further, Schedule A/B identifies a bank account for Imbrex but fails to recognize ownership of Imbrex or identify it as a "d/b/a." (Bankruptcy Case, Doc. 1, p. 12; Plaintiffs Ex. 9, p. 5.) The SOFA also fails to disclose Debtors' ownership of Roofing and Imbrex. (Bankruptcy Case, Doc. 1, p. 52, question 27.)

e.     Schedule A/B only identifies 3 bank accounts at Quail Creek Bank rather than the 4 bank accounts identified in the Bankruptcy Questionnaire. (Bankruptcy Case, Doc. 1, p. 12; Plaintiffs Ex. 9, p. 5.)

80.     On Schedule I, Debtors marked they did not expect any increase or decrease in their

income in the coming year on both the wet signature schedules and the Schedules filed in

the Bankruptcy Case because Aaron had ceased operating Roofing and did not have a job

lined up when the Bankruptcy Case was filed.  (Plaintiffs Ex. 18, p. 36; Bankruptcy Case,

Doc. 1, p. 37.)[29]

81.     McBride admitted that if information was contained in the Bankruptcy Questionnaire

completed by Debtors but not incorporated into the filed Petition, Schedules, and SOFA,

the fault is with McBride & Associates, not Debtors.

82.     Pendley never expressed any concerns about Debtors to McBride.  McBride does not

believe Debtors were hiding anything with respect to their financial matters disclosed in

the Bankruptcy Questionnaire but not included in the Petition, Schedules, or SOFA.

83.     McBride believes Debtors eventually turned over all documents requested by McBride &

Associates.

84.     On October 5, 2020, Debtors filed their Amended Schedules (the "First Amended

Schedules") and Amended Statement of Financial Affairs (the "First Amended SOFA")

in the Bankruptcy Case.[30]  Stipulation ¶ I.F.5; Bankruptcy Case, Doc. 20.

    a.      Amended Schedule D corrects the Wrong Address for Cross First Bank's

collateral and adds another creditor secured by Debtors' home.  (Bankruptcy Case,

Doc. 20, p. 3.)

---

[29]Aaron started a new job after September 1, 2020, having finished out all Roofing projects, with income from Roofing projects having stopped in July 2020.  Pendley instructed him to mark the change in income box "no."

[30]These amendments were prepared and filed by McBride & Associates.

24

b.      Question 27 in the Amended SOFA was corrected to reflect ownership interests in

Roofing and Imbrex.  (Bankruptcy Case, Doc. 20, p. 15.)

85.      The Hills commenced this adversary proceeding on November 9, 2020, as amended by

the amended complaint filed on November 17, 2020 (the "Complaint").  Stipulation

¶ I.F.6.

86.      Debtors subsequently filed an amended voluntary petition and amended Schedules A-F, J,

Summary of Assets and Liabilities, Declaration about an Individual Debtor's Schedules

(the "Second Amended Schedules"), Statement of Financial Affairs (the "Second

Amended SOFA"), and Verification of Creditor's Matrix (all amended) on December 18,

2020.[31]  Stipulation ¶ I.F.7; (Bankruptcy Case, Doc. 29.)

87.      The corrections and amendments of note in the Second Amended Schedules and Second

Amended SOFA are:

a.      Correction of the Wrong Address for the homestead in the Petition and Schedules;

b.      Correction of ownership of the homestead by the Trust in fee simple;

c.      Addition of a 2019 Jeep Cherokee to the Second Amended Schedule A/B;

d.      Addition of Cross First Bank account to the Second Amended Schedule A/B;

e.      Addition of ownership interest in Roofing and Imbrex to the Second Amended

Schedule A/B;

f.      Addition of ownership interest in Trust to the Second Amended Schedule A/B;

g.      Addition of Jessica's nursing license to the Second Amended Schedule A/B;

_____

[31]These amendments were prepared and filed by Debtors' counsel in this adversary
proceeding, Gary Hammond, rather than McBride & Associates, and are an effort to completely
clear up lingering errors identified in the Complaint.

h.    Addition of ownership interest in business assets including tools and a trailer to the Second Amended Schedule A/B;

i.    Reduction in transportation and health insurance expense in the Second Amended Schedule J; and

j.    Increase in Jessica's income for 2019 and 2018 on the Second Amended SOFA.

88.    Contrary to the Hills' claims, Debtors' income as stated in the Bankruptcy Case filings as compared to their filed income tax returns reconciles with the exception of an approximately $7,000 increase in income for "Debtor 2".

| Document | Income 2018 | Income 2019 | Year to Date 2020 |
|---|---|---|---|
| Annual Federal Tax Returns | Wages $17,535.00 Business ($59,041) | Wages $30,597.00 Business ($39,137) | |
| SOFA | Debtor 1 $17,535.00 Debtor $0.00 | Debtor 1 $30,597.00 Debtor 2 $0.00 | Debtor 1 $15,592.10 Debtor 2 $18,803.82 |
| First Amended SOFA | Debtor 1 $17,535.00 Debtor 2 $0.00 | Debtor 1 $30,597.00 Debtor 2 $0.00 | Debtor 1 $15,592.10 Debtor 2 $18,803.82 |
| Second Amended SOFA | Debtor 1 $0.0 Debtor 2 $24,146.00 | Debtor 1 $0.00 Debtor 2 $30,597.00 | Debtor 1 $0.00 Debtor 2 $18,758.65 |

As set forth above, the income disclosed in the SOFA, First Amended SOFA, and the Second Amended SOFA corresponds with Debtors' 2018 and 2019 federal income tax returns. The Hills' attacks on this disclosure based on gross receipts stated in the tax returns or cash flowing into Debtors' bank accounts shows a fundamental misunderstanding of what constitutes income. In re Meadows, No. 12-50510, 2012 WL 2411905, at *2 (Bankr. E.D. KY June 26, 2012) ("[G]ross receipts are not the same as 'gross income.'").

**Credibility**

89.   **The Hills.**  Throughout the Project the Hills claimed to be suspicious of a number of things.  However, the Hills lived in the Home during the entirety of the Project, with Mrs. Hill at the Home during the day and Dr. Hill returning to the Home each evening. Consequently, the Hills witnessed the daily construction and progress, and noted flooding concerns in February 2019, yet never questioned Aaron until October 2019.  In fact, the Hills allowed Aaron and Roofing to continue working on the Home in the same manner for the entire 18 month span of the Project – 3 times the time line set forth in the Contract – seemingly without question over the work completed by Aaron and Roofing. Neither of the Hills are confrontational and admittedly accepted Aaron's explanation for cost overruns and delays rather than "rocking the boat."  The Hills appear to be looking for someone (i) to blame for their inability (or unwillingness) to communicate their apparent dissatisfaction with Aaron and Roofing's work on their Home throughout the Project's duration; and (ii) to bear the cost of the Latent Defects.  From all accounts, until late September to early October 2019, the Hills were happy and satisfied with the Project, with Dr. Hill even expressing his satisfaction on social media.  (Defendants Ex. 4.)  The Hills ultimately failed to provide any evidence Aaron misused funds advanced by the Hills, failed to address their concerns as they were raised until October 2019, or was the cause of the additional expense flowing from the Latent Defects.

90.   **Debtors.**  Aaron appeared to be open and honest about the Project and his work thereon. Perhaps the Project was too large and too much for Aaron and Roofing; however, what made it too large and too much were the Latent Defects, something over which Aaron and

Roofing had no control.  With respect to the preparation and filing of their Bankruptcy

Case, both Debtors were credible and knowledgeable about the documents and

information supplied to McBride & Associates and the related time line.

91.    **Jay Pendley and David McBride.**  The Court views Pendley's testimony as largely

designed to protect his reputation rather than being truthful.  Pendley prepared the

original Petition, Schedules, and SOFA based on rather voluminous materials supplied

by Debtors.  He met in person with Debtors to review the same, and Debtors advised him

of multiple corrections.  Nevertheless, the original Petition, Schedules, and SOFA are

fraught with mistakes that should not have been contained therein given the documents

and information supplied by Debtors to Pendley and McBride & Associates.  Pendley

also testified it became more difficult to get information from Debtors; however,

Plaintiffs Exhibit 11, together with the completed Bankruptcy Questionnaire, contradicts

his claims.  When Pendley or McBride & Associates asked for information or

documentation, Debtors provided what was requested, generally in a short time frame.[32]

Given the completed Bankruptcy Questionnaire and the amount of other documentation

provided to Pendley and McBride & Associates, the original Petition, Schedules, and

SOFA are shockingly deficient not as a result of Debtors, but as a result of Pendley and

McBride & Associates not carefully digesting the information and documents provided

to them when preparing the bankruptcy documentation.  In contrast to Pendley,

---

[32]Additionally, Pendley spent an extensive amount of time testifying about his only
"parking lot" meeting with  Debtors consisting of Debtors signing a reaffirmation agreement - an
agreement that appears nowhere else in the record.  Pendley's version of the facts appeared to be
constructed in an effort to escape blame.

McBride's testimony was believable, and he accepted responsibility for the mistakes made when transferring the information supplied by Debtors into the bankruptcy documentation.

## CONCLUSIONS OF LAW

The Hills seek a determination from the Court that Debtors are not entitled to discharge pursuant to 11 U.S.C. § 727(a)(2)(A), (3), and (4)(a).[33]  They additionally seek a determination under Section 523(a)(2)(A) and (4) that damages arising from the Project are nondischargeable. The Hills, however, failed to establish the elements for any of their claims under either Section 727 or Section 523; therefore, judgment will be entered in favor of Debtors and against the Hills on all claims.

## I.   SECTION 727 - OBJECTIONS TO DISCHARGE

The provisions of Section 727 denying a debtor's discharge are construed liberally in favor of the debtor and strictly against the creditor.  Geyer & Associates CAP's, P.C. v. Stewart (In re  Stewart), Nos. CO–09–026, CO–09–027, 2009 WL 3724977, at *2 (10th Cir. BAP Nov. 9, 2009) (citing 6-727 *Collier on Bankruptcy* ¶ 727.01[4] (Alan N. Resnick & Henry J. Summer eds., 16th ed. rev. 2009)).  The legal standards for a denial of discharge are high because it is considered the "death knell" in bankruptcy.  Davis v. Baker (In re Baker), Adv. No. 20-5006, 2021 WL 2020287, at *5 (Bankr. D. Kan. May 20, 2021).  Denial of discharge is a harsh remedy reserved only for truly pernicious debtors.  Soft Sheen Prods., Inc. v. Johnson (In re Johnson), 98 B.R. 359, 367 (Bankr. N.D. Ill. 1988); O'Connor v. Leone (In re Leone), 463 B.R. 229, 248

---

[33]Unless otherwise indicated, hereafter all references to sections are to the Bankruptcy Code, Title 11 of the United States Code.

(Bankr. N.D. N.Y. 2011); <u>Hughes v. Wells</u> (<u>In re Wells</u>), 426 B.R. 579, 611 (Bankr. N.D. Tex. 2006)); <u>see also</u> <u>Baker</u>, 2021 WL 2020287, at *5.  As a result, "[t]he reason for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." <u>Lee v. Peeples</u> (<u>In re Peeples</u>), 779 F. App'x 561, 567 (10th Cir. 2019) (quoting <u>Jones v. Gertz</u>, 121 F.2d 782, 784 (10th Cir. 1941)).

The initial burden is upon the objecting creditor to establish a prima facie case by a preponderance of the evidence the debtor has committed acts which will prevent his or her discharge. <u>Stewart</u>, 2009 WL 3724977, at *2; <u>The Cadle Co. v. Stewart</u> (<u>In re Stewart</u>), 263 B.R. 608, 611-12 (10th Cir. BAP 2001), aff'd, 35 F. App'x 811 (10th Cir. 2002) (citing <u>Gullickson v. Brown</u> (<u>In re Brown</u>), 108 F.3d 1290, 1293 (10th Cir. 1997)).  Even if the creditor satisfies this burden of proof, however, the Court still has the discretion to grant or deny a discharge.  <u>Baker</u>, 2021 WL 2020287, at *5.

A.    **The Hills have not Established the Elements of a Section 727(a)(2)(A) Claim.**

Section 727(a)(2)(A) provides a debtor shall be granted a discharge unless:

> [T]he debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition.

11 U.S.C. § 727(a)(2).  "The objective of § 727(a)(2) is to prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of his assets." <u>Arma Yates, L.L.C. v. Robertson</u> (<u>In re Robertson</u>), No. 18-02059, 2022 WL 494165, at *7 (Bankr. D. Utah Feb. 17, 2022) (citing <u>Baker</u>, 2021 WL 2020287, at *6).  The debtor must have

30

the actual intent to defraud creditors in order to deny a discharge under Section 727(a)(2).

White v. White (In re White), Adv. Pro. 20-01061-SAH, 2021 WL 450992, at *8 (Bankr. W.D.

Okla. Feb. 8, 2021) (citing Marine Midland Bus. Loans, Inc. v. Carey (In re Carey), 938 F.2d

1073, 1077 (10th Cir. 1991)).  Fraudulent intent may, however, be established by circumstantial

evidence or inferences drawn from conduct.  White, 2021 WL 450992, at *8 (citing Mathai v.

Warren (In re Warren), 512 F.3d 1241, 1249 (10th Cir. 2008)).

      For a discharge to be denied pursuant to Section 727(a)(2), a creditor must establish by a

preponderance of the evidence:

> 1.    The act complained of was done at a time subsequent to one year before the date of the filing of the petition;
>
> 2.    With intent to hinder, delay or defraud a creditor or officer of the estate charged with custody of property under the Bankruptcy Code;
>
> 3.    The act was that of the debtor or his duly authorized agent; and
>
> 4.    The act consisted of transferring, removing, destroying or concealing any of the debtor's property or permitting any of these acts to be done.

Stewart, 2009 WL 3724977, at *2.  Omitting assets from bankruptcy schedules can constitute a

concealment.  Moore v. Sanchez (In re Sanchez), Adv. no. 19-1082-t, 2020 WL 4577113, *5

(Bankr. D. N.M. Aug. 7, 2020) (citing Los Alamos Nat'l Bank v. Lamey (In re Lamey), 574 B.R.

240, 248 (Bankr. D. N.M. 2017)).  The lynchpin of the Hills' Section 727(a)(2) claim is whether

there has been a concealment of Debtors' property with the subjective intent to hinder, delay, or

defraud a creditor.  Sanchez, 2020 WL 4577113, *5 (citing Wieland v. Gordon (In re Gordon),

509 B.R. 359, 371 (Bankr. N.D. Okla. 2014)).

Notwithstanding the Hill's plethora of evidence, nothing presented demonstrates Debtors transferred, removed, or concealed any of their property within the year preceding the Petition Date, much less a transfer, removal, or concealment made with the actual intent to hinder, delay, or defraud creditors.  The evidence paints a clear picture of Debtors' efforts to disclose their assets and financial affairs to McBride & Associates and facilitate the preparation of their Bankruptcy Case paperwork.  Their actions evince a good faith intent to fully disclose their assets.  The fact their Petition, Schedules, SOFA, Amended Schedules, and Amended SOFA did not accurately reflect their assets and financial condition is a direct result of McBride & Associates' failure to accurately and completely incorporate the information provided to it by Debtors into the relevant bankruptcy forms.  The Court is certainly reluctant to lay all of the blame at the feet of McBride & Associates given Debtors' ill advised choice in electing to not thoroughly review the Petition, Schedules, and SOFA before executing the same prior to filing. However, though such conduct "reflects a degree of carelessness, it does not necessarily indicate an actual intent to defraud creditors." Sanchez, 2020 WL 4577113, *6 (citing United States Trustee v. Garland (In re Garland), 417 B.R. 805, 815 (10th Cir. BAP 2009)).

Accordingly, the Hills failed to satisfy their burden, by a preponderance of the evidence, that Debtors concealed or transferred assets with the actual intent to defraud their creditors. Debtors are, therefore, entitled to judgment on the Hills' Section 727(a)(2) claim.

### B.    The Hills have not Established the Elements of a Section 727(a)(3) claim.

Under Section 727(a)(3), a debtor will be denied a discharge where the "debtor has concealed, mutilated, falsified or failed to keep or preserve any recorded information from which the debtor's financial condition or business transactions might be ascertained unless justified

under all of the circumstances of the case."  11 U.S.C. § 727(a)(3).  "In order to state a prima facie case, [the creditor] had to demonstrate that [the debtor] had failed to maintain and preserve adequate records and that the failure made it impossible to ascertain his financial condition and material business transactions."  Brown, 108 F.3d at 1295 (citing In re Folger, 149 B.R. 183, 188 (D. Kan.1992)).  See also Martinez v. Sears (In re Sears), 565 B.R. 184, 189 (10th Cir. BAP 2017).

Section 727(a)(3) requires proof:  (1) Debtors concealed, destroyed, mutilated, or falsified recorded information; (2) from which their financial conditions or business transactions might be ascertained; and (3) that their act/failure to act was not justified under the circumstances of the bankruptcy case.  McVay v. Perez (In re Perez), 411 B.R. 386, 401 (D. Colo. 2009); Brown, 108 F.3d at 1295.  Intent is not an element of a Section 727(a)(3) claim.  Cobra Well Testers, LLC v. Carlson (In re Carlson), No. 06–8158, 2008 WL 8677441, at *4 (10th Cir. Jan. 23, 2008) (first citing Meridian Bank v. Alten, 958 F.2d 1226, 1234 (3d Cir. 1992); and then citing Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 70 (1st Cir. 2004)).

At the close of the Hills' case in chief, Debtors moved for a directed verdict on the Hills' Section 727(a)(3) claim, which the Court granted.  The record before the Court was completely void of any evidence Debtors failed to maintain and preserve adequate records from which their business dealings and financial condition could be ascertained.  Brown, 108 F.3d at 1295 (citing Folger, 149 B.R. at 188).  See also Sears, 565 B.R. at 189.  To the contrary, a substantial amount of Debtors' and Roofing's business and financial records were before the Court and allowed the Court and the parties to "'reasonably . . . ascertain [Debtors'] present financial condition and to

follow [their] business transactions for a reasonable period in the past.'" Peeples, 779 F. App'x at 566 (citing Solis v. Asif (In re Asif), 455 B.R. 768, 791 (Bankr. D. Kan. 2011)).

Debtors are, thus, entitled to judgment on the Hills' Section 727(a)(3) claim.

**C.   The Hills have not Established the Elements of a Section 727(a)(4) Claim.**

In order to deny a debtor's discharge pursuant to Section 727(a)(4)(A), a creditor must demonstrate by a preponderance of the evidence the debtor knowingly and fraudulently made an oath relating to a material fact. Garland, 417 B.R. at 814 (citing Brown, 108 F.3d at 1294). The policy behind such rule is simple – if a person chooses to avail himself of the benefits of bankruptcy relief, he becomes subject to many responsibilities, one of which is to fully disclose any and all interests in property. Garland, 417 B.R. at 814-15. The debtor must disclose every interest and is not to make disclosure decisions based on deemed value or importance of interests in property. Garland, 417 B.R. at 815 (citing Freelife Int'l LLC v. Butler (In re Butler), 377 B.R. 895, 923 (Bankr. D. Utah 2006)).

"Albeit harsh, the primary purpose of a 'false oath' discharge exception is to 'ensure that dependable information is supplied for those interested in the administration of the bankruptcy estate . . . without the need for the trustee or other interested parties to dig out the true facts in examinations or investigations.'" Mashburn v. Gentry (In re Gentry), Adv. Pro. 21-01017-SAH, 2022 WL 198856, at *7 (Bankr. W.D. Okla. Jan. 21, 2022) (citing Layng v. Sgambati (In re Sgambati), 584 B.R. 865, 871 (Bankr. E.D. Wis. 2018)). "This purpose notwithstanding, '[c]areless or sloppy preparation of schedules, although an impediment to proper and efficient administration of the Chapter 7 estate, do not support denial of a discharge under § 727(a)(4)(A) absent a supportable inference of fraudulent intent.'" Schindler v. Milliron (In re Milliron),

34

629 B.R. 893, 912 (Bankr. D. Alaska 2021) (citing Garcia v. Coombs (In re Coombs), 193 B.R. 557, 567 (Bankr. S.D. Cal. 1996)).

A false oath may be either (i) a false statement or omission in the schedules or statement of financial affairs or (ii) a false statement by the debtor at an examination during the bankruptcy case. Garland, 417 B.R. at 814; Woolman v. Wallace (In re Wallace), 289 B.R. 428, 434-35 (Bankr. N.D. Okla. 2003). Here, the omissions and errors in the Petition, Schedules, and SOFA, and the Amended Schedules, and the Amended SOFA, are, in fact, false statements made under oath. PNC Bank, N.A. v. Leongas (In re Leongas), 628 B.R. 71, 107 (Bankr. N.D. Ill. 2021).

### 1.    The False Oaths must be Material.

"'The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" Garland, 417 B.R. at 814 (first citing Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984); and then citing Job v. Calder (In re Calder), 907 F.2d 953, 955 (10th Cir. 1990)). A finding of materiality within Section 727(a)(4)(A) cannot be defeated by the fact that the undisclosed property or interests are of little to no value. Garland, 417 B.R. at 814 (citing Calder, 907 F.2d at 955). Omitting information concerning the existence and disposition of a debtor's property is considered material regardless of the value involved. Calder, 907 F.2d at 955.

Here, some of the false oaths by Debtors were clerical and, therefore, not material, such as the Wrong Address. The remaining false oaths made in the Schedules, SOFA, First Amended Schedules, and First Amended SOFA were, for the most part, material. They pertain to Debtors' ownership of Roofing and Imbrex, a missing bank account, how Debtors own their home, the

creation and beneficiary status of the self-settled Trust to hold their home, the omission of

Jessica's nursing license, and the absence of business assets.  All these errors bear a relationship

to Debtors' assets and business transactions and, thus, are material.

### 2.     The False Oath must be made with Fraudulent Intent.

Proving a debtor acted with fraudulent intent is difficult because the debtor typically will

be the only person able to testify directly concerning his or her intent and is usually unlikely to

admit their intent in acting or failing to act was fraudulent.  Garland, 417 B.R at 815.  However,

fraudulent intent may be inferred from the facts and circumstances of a case.[34]  Garland, 417 B.R.

at 815.  Generally, mistake or inadvertence is not sufficient to bar a debtor's discharge under

Section 727(a)(4)(A); however, reckless indifference to the truth has consistently been treated

as the functional equivalent of fraudulent intent under Section 727(a)(4)(A).  Garland, 417 B.R.

at 815 (citing Cadle Co. v. King (In re King), 272 B.R. 281, 302 (Bankr. N.D. Okla. 2002)).

"The 'mistake' or 'I didn't think it was important' defenses have their limits.  'A debtor has an

uncompromising duty to disclose whatever ownership interests are held in property,' and 'it is

not for the debtor to pick and choose or obfuscate the answers.'"  The Shack, LLC v. Hickman

(In re Hickman), 616 B.R. 815, 822-23 (Bankr. W.D. Okla. 2020), appeal dismissed sub nom.

Hickman v. Shack, LLC, No. AP 19-01042, 2020 WL 5049206 (W.D. Okla. Aug. 21, 2020)

---

[34]Over time, the courts have developed certain badges of fraud which, when present, may indicate fraudulent intent including, without limitation:  (i) concealment of pre-bankruptcy conversions; (ii) conversion of assets immediately prior to the bankruptcy filing; (iii) gratuitous transfers of property; (iv) continued use by the debtor of transferred property; (v) transfers to family members; (vi) obtaining credit to purchase exempt property; (vii) conversion of property after entry of judgment against the debtor; (viii) pattern of sharp dealing by the debtor prior to the filing; (ix) insolvency of the debtor as a result of conversion of assets; and (x) the monetary value of assets converted.  Garland, 417 B.R. at 815 (citing Quicken Loans, Inc. v. Splawn (In re Splawn), 376 B.R. 747, 755 (Bankr. D. N.M. 2007)).

(first citing <u>Fokkena v. Tripp</u> (<u>In re Tripp</u>), 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998); and then

citing <u>In re Yonikus</u>, 974 F.2d 901, 904 (7th Cir. 1992)). "'Debtors have an absolute duty to

report whatever interest they hold in property, even if they believe the assets are worthless or are

unavailable to the bankruptcy estate.'"  <u>Hickman</u>, 616 B.R. at 822-23 (citing <u>Yonikus</u>, 974 F.2d

at 904).  Because errors and omissions made during the course of a bankruptcy case vary in

impact on the bankruptcy case, the totality of a debtor's errors and omission can be considered in

determining if fraudulent intent is present.  <u>Takada v. Isaacson</u> (<u>In re Isaacson</u>), 564 B.R. 380,

385 (Bankr. N.D. Ill. 2017) (citing <u>Stamat v. Neary</u>, 635 F.3d 974, 978 (7th Cir. 2014)).

Nevertheless, "'a false statement resulting from ignorance or carelessness does not rise to the

level of 'knowing and fraudulent' sufficient to deny a discharge.'"  <u>Layng v. Ridley</u> (<u>In re

Ridley</u>), 2017 WL 1906589, at *4 (Bankr. D. Wyo. May 9, 2017) (citing <u>McVay v. DiGesualdo</u>

(<u>In re DiGesualdo</u>), 463 B.R. 503, 522 (Bankr. D. Colo. 2011)).

The question is whether Debtors' false oaths were the result of simple carelessness or

were deliberate and fraudulent.  <u>Milliron</u>, 629 B.R. at 918.  The Hills failed to present evidence

showing the errors and omissions in the Petition, Schedules, and SOFA, the First Amended

Schedules, First Amended SOFA, Second Amended Schedules, or Second Amended SOFA were

anything but the result of carelessness, both on Debtors' part and, in larger part, their counsel.  In

virtually every instance claimed to be a "false oath," Debtors provided the correct information to

McBride & Associates, who then failed to put the correct information into the documentation

filed with the Court.  Moreover, Debtors testified they reviewed the Petition, Schedules, and

SOFA and identified errors and omissions to Pendley before the documents were signed and

filed.  Their mistake, and therefore responsibility, is in believing the errors and omissions had

been corrected based solely on Pendley's representations without confirming for themselves

before signing them. But, based on these specific facts, fault for the error does not equate with

fraudulent intent.

While it is incumbent upon Debtors to carefully review their bankruptcy petition,

Schedules, and SOFA prior to signing them to ensure they are, in fact, true and correct, the errors

and omissions in this case stem from McBride & Associates' failures and practice more than

Debtors. Debtors relied on McBride & Associates to prepare their bankruptcy documentation

completely and accurately from the voluminous records provided by Debtors. Rutili v.

O'Neill (In re O'Neill), 468 B.R. 308, 332 (Bankr. N.D. Ill. 2012). No evidence indicates

Debtors intentionally withheld any financial or other information from McBride & Associates in

connection with preparing the Petition, Schedules, and SOFA. O'Neill, 468 B.R. at 330. And,

when errors and omissions were discovered, Debtors filed the Amended Schedules, Amended

SOFA, Second Amended Schedules, and Second Amended SOFA to correct the errors and

omissions. Moreover, the information corrected or added was generally information provided to

McBride & Associates *prior to the Bankruptcy Case being filed*. An "honest mistake resulted

from the Debtors providing voluminous information and documents to their bankruptcy counsel

in reliance on counsel to completely and accurately complete the [bankruptcy documents] and

then reviewing the [bankruptcy documents] and Amended [bankruptcy documents] without

sufficient care for their completeness." O'Neill, 468 B.R. at 332 (citing Bernhardt v. Radloff

(In re Radloff), 418 B.R. 316, 326 (Bankr. D. Minn. 2009)).

Debtors also did not exhibit a reckless disregard for their obligation to provide full and

complete information. Rather, given the amount of documents and information provided to

McBride & Associates, their review of the draft Petition, Schedules, and SOFA, and their requests for revisions and corrections thereto, Debtors demonstrated the opposite. When they signed the same prior to filing, they were assured their revisions and corrections had been made and did not know the Schedules and SOFA remained inaccurate. While Debtors were certainly careless to not review the Petition, Schedules, and SOFA again prior to filing to confirm them as true and correct, their efforts otherwise demonstrate a good faith attempt to be honest and forthright debtors. Isaacson, 564 B.R. at 388. Debtors' mere carelessness carries no inference of intent to defraud.

Moreover, it is clear Debtors were not trying to hide substantial assets, specifically their home or their ownership of Roofing and Imbrex. Their home was scheduled albeit by a wrong address. Further, Roofing and Imbrex were both identified in the Schedules and SOFA albeit in reference to bank accounts. Had Debtors been attempting to conceal such assets, these references would not have been made.

Finally, the errors and omissions were not substantial and, quite simply, did not impact, much less negatively impact, the administration of Debtors' bankruptcy estate. Isaacson, 564 B.R. at 389. The record contains no evidence the errors and omissions in the documents filed by Debtors in the Bankruptcy Case impeded the administration of their estate. Similarly, the chapter 7 trustee never voiced any concern or complaint over Debtors' disclosures or conduct in the Bankruptcy Case. And the Hills have not identified any property not being administered as property of the estate because of the errors and omissions in the Petition, Schedules, SOFA, Amended Petition, Amended Schedules, or Amended SOFA. Debtors provided all necessary information and documentation to McBride & Associates – they were not trying to hide anything.

39

The problem is the information failed to make it into their filed documents.[35]  The facts simply

do not establish a scheme or intent to deceive anyone.

"What is notably missing from the evidence presented, is any allegation or evidence that

Debtors acted with an overt intent to deceive any party during the course of the bankruptcy

proceedings." Isaacson, 564 B.R. at 386.  A debtor's reliance on counsel to complete the

required bankruptcy forms using information supplied by them in a manner consistent with the

statutory requirements suggests no knowledge or fraudulent intent on the part of a debtor.

Isaacson, 564 B.R. at 386 (first citing Bernhardt v. Radloff (In re Radloff), 418 B.R. 316, 326

(Bankr. D. Minn. 2009); then citing O'Neill, 468 B.R. at 341; and then citing In re Kempff,

847 F.3d 444, 450-451 (7th Cir. 2017)).  The voluminous materials and detailed financial

information provided to McBride & Associates by Debtors over the course of 5 months prior to

the Bankruptcy Case filing belie any inference of an intent to deceive creditors, the trustee, or

this Court.  Isaacson, 564 B.R. at 387.

The Court finds Debtors did not knowingly and fraudulently make an oath relating to a

material fact with the intent to defraud.  They are, therefore, entitled to judgment on the Hills'

Section 727(a)(4) claim.

## II.    EXCEPTIONS TO DISCHARGE - SECTION 523(a).

"[A] central purpose of the [Bankruptcy] Code is to provide a procedure by which

certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy

'a new opportunity in life with a clear field for future effort, unhampered by the pressure and

---

[35]McBride admitted responsibility for the missing information provided by Debtors but
not included in the Bankruptcy Case filings, placing blame squarely on Pendley and McBride &
Associates rather than Debtors.

discouragement of preexisting debt.' But, a completely fresh start is limited to the 'honest but unfortunate debtor.'" Jensen, 2019 WL 2403105, at *4 (citing Grogan v. Garner, 498 U.S. 279, 286 (1991)). Given the fresh start objectives of the Bankruptcy Code, exceptions to a debtor's discharge under Section 523(a) are narrowly construed, and doubt as to the meaning and scope of Section 523(a) is to be resolved in a debtor's favor. DSC Nat'l Props., LLC v. Johnson (In re Johnson), 477 B.R. 156, 168 (10th Cir. BAP 2012) (citing Carlson, 2008 WL 8677441, at *2). Accordingly, the provisions of Section 523(a) are construed liberally in favor of the debtor and strictly against the creditor. Hagmeier v. Cooley (In re Cooley), 551 B.R. 498, 502 (Bankr. W.D. Okla. 2016) (citing Duff v. Ayala (In re Ayala), 516 B.R. 645, 650 (Bankr. D. N.M. 2014)).

A creditor seeking to avoid discharge bears the burden of proving the elements of Section 523(a) by a preponderance of the evidence. Jensen, 2019 WL 2403105, *4 (citing Grogan, 498 U.S. at 287); The Northern New Mexico Orthopaedic Center, P.C. v. Auge (In re Auge), No. 14-10443 T11, 2015 WL 1867894, at *3 (Bankr. D. N.M. Apr. 22, 2015) (citing Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir.1996)). Consequently, proving a debt should be excepted from a debtor's discharge under Section 523(a) "is an uphill battle." Jensen, 2019 WL 2403105, at *4 (citing Meyer v. Hobi (In re Hobi), No. WO-11-025, 2011 WL 5869488, at *4 (10th Cir. BAP Nov. 23, 2011)).

A.    **The Hills have not Established the Elements of a Section 523(a)(2)(A) Claim.**

Under Section 523(a)(2)(A), debts may be excepted from discharge if they are for money, property, or services obtained by a debtor's false representations, false pretenses, or actual fraud (other than a statement respecting the debtor's or an insider's financial condition). Most Section 523(a)(2)(A) claims to except debts on account of a debtor's fraud involve misrepresentations.

41

See McClellan v. Cantrell, 217 F.3d 890, 892-93 (7th Cir. 2000).  Such is the case with the Hills'

claims against Debtors.[36]

The elements of the usual Section 523(a)(2)(A) claim for false representation are:  (i) the

debtor made a false representation; (ii) the debtor made the representation with the intent to

deceive the creditor; (iii) the creditor relied on the debtor's representation; (iv) the creditor's

reliance was justifiable; and (v) the creditor was damaged as a proximate result.  Young, 91 F.3d

at 1373 (citing Grogan, 498 U.S. at 287, as modified by Field v. Mans, 516 U.S. 59, 70 (1995)).

There is no evidence Aaron made false representations to the Hills with fraudulent intent.

At the conclusion of trial, the Court could identify only one possible false representation made by

Aaron and Roofing to the Hills – that he was a licensed roofer.  However, in Plaintiffs' Closing

Arguments, the Hills identify 4 alleged misrepresentations:

1.      Having a roofing license;

2.      Promising to use licensed subcontractors;

3.      Failing to disclose defects in workmanship; and

4.      Using used materials.

Closing Argument, p. 12.

With respect to the roofing license representation, the evidence established Aaron or

Roofing had a roofing license when the Contract was signed.  The roofing license was not

---

[36]While the Final Pretrial Order [Doc. 56] suggests the Hills were pursuing a Section
523(a)(2)(A) claim based on fraudulent misrepresentation, false pretenses, and fraud, Plaintiffs'
Closing Argument [Doc. 74] is clear the claim is based solely on fraudulent misrepresentation.
Closing Argument [Doc. 74], generally (discusses only claims under Sections 523(a)(2)(A) and
727(a)(2)(A) and (4)(A)).  As a result, the Court will not discuss and apply the elements of a
Section 523(a)(2)(A) claim based on false pretenses and actual fraud.

renewed and was later suspended.  But this cannot form a basis for a Section 523(a)(2)(A)
misrepresentation because, when the Contract was entered into and the representation was made,
Aaron had a roofing license and so he made no misrepresentation at that time.  The same holds
true for using unlicensed subcontractors.  To prevail on such a misrepresentation in the Contract
under Section 523(a)(2)(A), the Hills were required to establish by a preponderance of the
evidence Aaron did not *intend* to use only licensed subcontractors on the Project when he entered
into the Contract.  No evidence suggests such intent much less proves it by a preponderance of
the evidence.  These representations amount to, at best, a breach of contract but fall short of
establishing the fraudulent intent necessary for a Section 523(a)(2)(A) claim.  The same is
equally true for the defective workmanship and materials used by Aaron and Roofing.

With respect to Aaron's skill and competency to undertake the Contract, Aaron was a
credible witness regarding his skills and ability to complete the Project.  Aaron was also
believable as to extent of the Latent Defects and their impact on completion of the Project.

> Plaintiff puts forward a compelling argument that Defendant did
> not build a proper house, but this is not the same as an argument
> that Defendant could not have done so, nor that Defendant
> honestly, or even negligently, believed at the time he made the
> representations that he would do so.  In essence, what Plaintiff
> seeks is a factual determination that Defendant, at the time the
> representations were made, knew he could not or would not
> perform as represented.  See Yunkers v. Whitcraft 57 N.M. 642,
> 261 P.2d 829 (1953) (fraud not shown when evidence did not
> establish that defendants did not intend to perform in the future as
> promised).

Grove v. Beaver (In re Beaver), 454 B.R. 184, 190-91 (Bankr. D. N.M. 2011).  While it is
possible Aaron was in over his head on the Project, such conduct is negligence at worst.
Although the Hills claim Aaron did not complete the Project per the Contract and its

43

specifications, they failed to present the evidence necessary to establish Aaron did not have the intention and skills to complete the Project as promised when promised.  Jensen, 2019 WL 2403105 at *6.  Without evidence, whether direct or circumstantial, Aaron intended to provide defective workmanship and materials, these alleged misrepresentations do not give rise to relief under Section 523(a)(2)(A).

A finding of fraud under Section 523(a)(2)(A) cannot be premised upon a mere breach of contract.  To be actionable as fraud, the plaintiff must establish that the debtor entered into the contract with the intent of never complying with its terms.  Carlson, 2008 WL 8677441, at *3; First Baptist Church v. Maurer (In re Maurer), 112 B.R. 710, 713 (Bankr. E.D. Pa. 1990).  Boiled down to its simplest terms, the Hills' claims against Aaron are mere breach of contract claims subject to discharge.

Accordingly, the Hills failed to establish a false representation claim under Section 523(a)(2)(A), and Aaron is entitled to judgment on such claim.

### B.    The Hills have not Established the Elements of a Section 523(a)(4) Claim.

Pursuant to Section 523(a)(4), a debtor's discharge does not apply to debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  Notably, the Hills do not address this claim in their Plaintiffs' Closing Argument, which makes sense given the lack of evidence establishing such a claim.

To state a claim under Section 523(a)(4) for fraud while acting in a fiduciary capacity, "a plaintiff must allege that:  (1) a fiduciary relationship existed between the debtor and the creditor, and (2) the debt owed to the creditor is attributable to a fraud or defalcation committed by the debtor in the course of the fiduciary relationship."  Jensen, 2019 WL 2403105, at *9

44

(citing <u>Barenberg v. Burton</u> (<u>In re Burton</u>), No-CO-10-022, 2010 WL 3422584, at *5 (10th Cir.

BAP Aug. 31, 2010).  To fall within the confines of Section 523(a)(4)'s definition of "fiduciary

duty," the relationship must be more than an ordinary commercial or contractual relationship.

<u>Jensen</u>, 2019 WL 2403105, at *9 (citing <u>Webb v. Isaacson</u> (<u>In re Isaacson</u>), 478 B.R. 763, 780

(Bankr. E.D. Va. 2012); <u>Zio Johnos, Inc. v. Ziadeh</u> (<u>In re Ziadeh</u>), 284 B.R. 893, 899 (Bankr.

E.D. Iowa 2002) (citing <u>Werner v. Hofmann</u>, 5 F.3d 1170, 1172 (8th Cir. 1993)).  A fiduciary

relationship within the parameters of Section 523(a)(4) must be either an express or technical

trust arising prior to the fraudulent conduct.  <u>Jensen</u>, 2019 WL 2403105, at *9 (citing <u>Young</u>,

91 F.3d at 1371-72).   Here no evidence established either an express or technical trust between

the Hills and Debtor.

Nondischargeability under Section 523(a)(4) may also rest on proof of embezzlement or

larceny without the existence of a fiduciary relationship.  <u>Oil States Industries, Inc. v. Nambakam</u>

(<u>In re Nambakam</u>), Adv. No. 19-01108-SAH, 2021 WL 3777567, at *5 (Bankr. W.D. Okla.

Aug. 25, 2021) (citing <u>Klemens v. Wallace</u> (<u>In re Wallace</u>), 840 F.2d 762, 765 (10th Cir. 1988)).

Embezzlement is the fraudulent appropriation of property by a person to whom such property has

been entrusted or into whose hands it has lawfully come.  <u>Nambakam</u>, 2021 WL 3777567, at *5

(citing <u>Bombardier Capital, Inc. v. Tinkler</u> (<u>In re Tinkler</u>), 311 B.R. 869, 876 (Bankr. D. Colo.

2004).  The Hills presented no evidence Aaron used or consumed property entrusted to him for a

purpose other than that for which it was entrusted with fraudulent intent.  <u>Nambakam</u>, 2021 WL

3777567, at *5 (citing <u>Tinkler</u>, 311 B.R. at 876).

"'Larceny is proven for Section 523(a)(4) purposes if the debtor has wrongfully and with

fraudulent intent taken property from its owner.'"  <u>Nambakam</u>, 2021 WL 3777567, at *5 (citing

Tinkler, 311 B.R. at 876).  As with the embezzlement claim, the Hills failed to present evidence establishing by a preponderance of the evidence Aaron took the Hills' property with the intent to convert it to his use and permanently deprive the Hills' of such property.  Nambakam, 2021 WL 3777567, at *5 (citing Nibbi v. Kilroy (In re Kilroy), 357 B.R. 411, 431 (Bankr. S.D. Tex. 2006)).

While the Hills and Pana claimed Aaron "robbed Peter to pay Paul," it was a mere conclusory statement without any supporting evidence.  The Hills introduced no evidence whatsoever Aaron and/or Roofing used payments from the Hills for anything other than completion of the Project.  In contrast, Aaron provided an accounting of funds received from the Hills and fully accounted for their use.

The Hills have failed to prove their Section 523(a)(4) claim by a preponderance of the evidence, thus Aaron is entitled to judgment on the Section 523(a)(4) claim.

## **CONCLUSION**

For the reasons set forth above, judgment is entered (i) in favor of Debtors and against the Hills on all claims under Section 727(a)(2), (3), and (4)(A) and Debtors' discharge should be entered; and (ii) in favor of Aaron and against the Hills on all claims under Section 523(a)(2)(A) and (a)(4).  A separate judgment will be issued.

IT IS SO ORDERED.

#   #   #